IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANDREW PUNG, ANDY'S CAR CARE SERVICE, INC., RICKY Y. YAMASAKI and RICKY YAMASAKI ENTERPRISES, INC., on their own behalf and on behalf of all others similarly situated,<br><br>　　　　Plaintiffs,<br><br>　vs.<br><br>TRUSTSTREET PROPERTIES, INC., a Maryland corporation; FUEL SUPPLY, INC., a Texas corporation; USRP (SARAH), LLC; USRP (BOB), LLC; USRP (FRED), LLC; all Texas limited liability companies; CNL APF PARTNERS, L.P., a Delaware limited partnership; USRP MANAGING, INC.; JOHN DOES 1-10, JANE DOES 1-10, DOE PARTNERSHIPS 1-10, DOE CORPORATIONS 1-10, DOE LIMITED LIABILITY COMPANIES 1-10, DOE GOVERNMENTAL UNITS 1-10 and DOE ENTITIES 1-10,<br><br>　　　　Defendants.<br>_____ | CV NO 05-00618 DAE/KSC |

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Court heard Defendants' Motion on October 30, 2006.  Mark Kawata, Esq., appeared at the hearing on behalf of Plaintiffs; David Minkin, Esq., and Elizabeth Robinson, Esq., appeared at the hearing on behalf of Defendants. After reviewing the motion and the supporting and opposing memoranda, the Court GRANTS Defendants' Motion for Summary Judgment.

BACKGROUND

Until 1996, Plaintiffs Andrew Pung and Andy's Car Care Service, Inc., ("Plaintiffs") owned and operated a gasoline dealership in Hawaii on property leased from Texaco, Inc ("Texaco").[1]  As a Texaco dealer, Plaintiffs were covered by the provisions of Petroleum Marketing Practices Act, 15 U.S.C. § 2801, et. seq. ("PMPA").  In 1996, Texaco and Shell Oil Company ("Shell") entered into an agreement to combine the companies' refining and distribution operation in the United States.  In order to obtain approval from the Federal Trade Commission and the Attorney General for the State of Hawaii for the proposed merger, Equilon Enterprises, LLC ("Equilon"), the joint venture of Texaco and Shell, agreed to divest itself of its Texaco assets in Hawaii, including the gasoline distribution

_____

[1]On October 25, 2006, this Court granted a stipulation to dismiss with prejudice all claims by Ricky Y. Yamasaki and Ricky Yamasaki Enterprises, Inc.

2

terminals and service stations/convenience stores.  In August 1998, Equilon agreed to sell the former Texaco properties to a real estate investment trust named U.S. Restaurant Properties, Inc. ("USRP").  This sale included the land upon which Plaintiffs' service station was situated.  As a result of the merger, Plaintiffs' lease would be sold to USRP.

On December 23, 1998, Plaintiffs and other similarly situated service stations brought suit in the United States District Court for the District of Hawaii to enjoin the sale to USRP.  Leroy's, Inc. v. Texaco Refining & Mktg., Inc., Civ. No, 98-896 DAE.  The service station owners were concerned that the proposed sale would abridge or extinguish their rights under the PMPA.  Eventually, the parties reached a settlement through which the service stations agreed to new leases with a petroleum distributer named BC Oil Ventures, LLC ("BC Oil").  BC Oil, in turn, leased Plaintiffs' premises from two limited liability companies controlled by USRP, namely, Defendants USRP (BOB), LLC, and USRP (FRED), LLC.  Under the new leases, USRP and BC Oil agreed to provide the service stations with any PMPA protections that they would have previously been entitled to.

On March 12, 1999, Plaintiffs entered into a five-year lease ("Sublease Agreement") with BC Oil.  Plaintiffs allege in their Complaint that they and Defendants "agreed on the form of the Subleases, and attachments thereto,

3

including a Consent, Nondisturbance and Attornment Agreement . . ." (Compl. at

¶ 44.) The Consent, Nondisturbance and Attornment Agreement ("Attornment

Agreement"), which was attached to the sublease, provides in pertinent part that:

> [Plaintiffs] hereby agree[] that if the Master Lease is
> terminated for any reason prior to the expiration of the
> term of the Retail Facility Lease . . . [Plaintiffs] will
> thereupon attorn to Master Lessor or its designee with
> respect to the Retail Facility Lease, will thereafter be the
> direct tenant and lessee of Master Lessor or its designee
> under the Retail Facility Lease, and will thereafter, for
> the remainder of the term of the Retail Facility Lease,
> faithfully perform and observe for the benefit of Master
> Lessor or its designee all of the covenants and conditions,
> except such covenants and conditions as shall be
> obviously inapplicable, by [Plaintiffs] to be observed and
> performed as sublessee under the Retail Facility Lease,
> including, but not limited to, the payment to Master
> Lessor or its designee of all rent therein reserved and the
> payment of all taxes, assessments, rates, and other
> charges therein stipulated to be paid.

The Attornment Agreement was attached as Exhibit A to the Sublease Agreement.

Under the terms of the Sublease Agreement, BC Oil was required to procure

USRP's signature, which it failed to do.

On or around July 24, 2000, BC Oil filed for bankruptcy protection in

the United States Bankruptcy Court for the Central District of California.

Notwithstanding the ongoing bankruptcy proceedings, Plaintiffs initially continued

to pay rent to BC Oil pursuant to the Sublease Agreement. In April 2001, as a

4

result of BC Oil's bankruptcy filing, the bankruptcy court approved the rejection of the master leases between BC Oil and USRP BOB and USRP FRED.  By letter of July 9, 2001, USRP informed Plaintiffs that the bankruptcy court had terminated their Sublease Agreement with BC Oil, and therefore they should send their monthly payments directly to USRP.  The letter further stated that "[Plaintiffs] will be receiving a new lease with USRP in the mail in the next couple of weeks.  That lease agreement will provide [Plaintiffs] with instructions for future rent payments."

USRP and Plaintiffs never signed or otherwise documented a new lease, but instead, Plaintiffs remained in possession of the property and USRP continued to receive and process rent payments consistent with the Sublease Agreement until the expiration of the lease term in May 2004.

On August 23, 2005, Plaintiffs brought the present action to recover payments, which they claim exceeded the amount permissible under Section 486H-10.4 of the Hawaii Revised Statutes.  Plaintiffs assert that they overpaid at least $117,000 between August 2001 and May 2004.  On August 30, 2006, Defendants filed a motion for summary judgment on the basis that Plaintiffs are precluded from recovering under Section 486H-10.4 of the Hawaii Revised Statutes on the

basis that the parties never renewed a lease.  Plaintiffs' filed their opposition on

October 12, 2006, and Defendants submitted their reply on October 19, 2006.

STANDARD OF REVIEW

Rule 56 requires summary judgment to be granted when "the

pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.

Civ. P. 56(c); see also Porter v. Cal. Depot of Corr., 419 F.3d 885, 891 (9th Cir.

2005); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  A main

purpose of summary judgment is to dispose of factually unsupported claims and

defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to

demonstrate facts to establish what will be an essential element at trial.  See id. at

323.  A moving party without the ultimate burden of persuasion at trial––usually,

but not always, the defendant–has both the initial burden of production and the

ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire &

Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden

initially falls upon the moving party to identify for the court "those portions of the

materials on file that it believes demonstrate the absence of any genuine issue of

material fact." <u>T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d

626, 630 (9th Cir. 1987) (citing <u>Celotex Corp.</u>, 477 U.S. at 323).

      Once the moving party has carried its burden under Rule 56, the

nonmoving party "must set forth specific facts showing that there is a genuine

issue for trial"and  may not rely on the mere allegations in the pleadings.  <u>Porter</u>,

383 F.3d at 891 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256

(1986)).  In setting forth "specific facts," the nonmoving party may not meet its

burden on a summary judgment motion by making general references to evidence

without page or line numbers.  <u>S. Cal. Gas Co. v. City of Santa Ana</u>, 336 F.3d 885,

889 (9th Cir. 2003); Local Rule 56.1(f) ("When resolving motions for summary

judgment, the court shall have no independent duty to search and consider any part

of the court record not otherwise referenced in the separate concise statements of

the parties.").  "[A]t least some 'significant probative evidence'" must be

produced.  <u>T.W. Elec. Serv.</u>, 809 F.2d at 630  (quoting <u>First Nat'l Bank v. Cities</u>

<u>Serv. Co.</u>, 391 U.S. 253, 290 (1968)).  "A scintilla of evidence or evidence that is

merely colorable or not significantly probative does not present a genuine issue of

material fact."  <u>Addisu</u>, 198 F.3d at 1134.

      When "direct evidence" produced by the moving party conflicts with

"direct evidence" produced by the party opposing summary judgment, "the judge

must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." T.W. Elec. Serv., 809 F.2d at 631. In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party. Porter, 419 F.3d at 891. The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage. Id. However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. T.W. Elec. Serv., 809 F.2d at 631.

DISCUSSION

Hawaii Revised Statute Section 486H-10.4 took effect on August 1, 1997. This provision established limits on the maximum rent that a jobber or manufacturer may charge a dealer who operated a retail gas station. In particular, the statute provides that "[u]pon renewal, the lease rent payable shall not exceed fifteen per cent of the gross sales, except for gasoline, which shall not exceed fifteen percent of the gross profit of the product . . ." Haw. Rev. Stat. § 486H-10.4(c)(2). The statute does not apply to existing contracts in conflict with these provisions. Id. Rather, the cap provisions of the statute are only triggered "upon renewal" of a franchise agreement. Id.

8

In the instant case, Plaintiffs contend that a "renewal" occurred on two separate occasions. Initially, they contend that the original Sublease Agreement entered into on March 12, 1999 was effectively a "renewal" of a previous lease, and therefore should have been subject to the gas cap provisions. Next, they claim that following the bankruptcy court's rejection of the Sublease Agreement, their continued payments of rent directly to USRP constituted a "renewal."

I.     The March 12, 1999 Lease

Plaintiffs' contention that the March 12, 1999 lease constitutes a renewal is without merit. As previously noted in this Court's January 27, 2006 Order Denying Defendants' Motion to Dismiss, the provisions of Section 486H-10.4, are only triggered upon "renewal" of a lease as opposed to a new lease. There is no question that any previous lease agreements that Plaintiffs had were with Texaco. Texaco, through Equilon, sold Plaintiffs' property to USRP who then leased it to BC Oil. While the previous lease is not before the Court, the fact that the Sublease Agreement was with a completely independent party strongly suggests that the Sublease Agreement was a new lease as opposed to a "renewal" under Section 486H-10.4. Furthermore, even assuming *arguendo*, that the new lease was a renewal for purposes of the statute, Plaintiffs' remedy would lie against

BC Oil as its lessor as opposed to USRP, and any claims for damages should have been asserted as part of the bankruptcy proceeding.

II.   Renewal As Occurring Subsequent To The Bankruptcy Proceeding

A.   The Attornment Agreement

There is no question that under the terms of the Attornment Agreement, in the event that the Master Lease between BC Oil and USRP was terminated, Plaintiffs would then become the direct tenants of USRP and honor their obligations and covenants under the Sublease Agreement to the benefit of USRP.  However, Plaintiffs contend that the bankruptcy order terminated the Sublease Agreement, and therefore extinguished any obligations that existed under the Attornment Agreement.  This Court agrees.

On June 26, 2001, the bankruptcy court issued an order approving BC Oil's rejection of its non-residential, real property leases, i.e. the Sublease which encompassed the Attornment Agreement.  Furthermore, USRP's July 9, 2001 letter to Plaintiff explicitly stated that "the U.S. Bankruptcy court has invalidated the lease that [Plaintiffs] had with B.C. Oil, LLC."  (Plaintiff's Ex. 2 in support of their Opposition to Def.'s Mot. for Summ J.)  USRP notified Plaintiffs that they would be receiving a new lease with instructions for future rent payments, and in the

interim, directed them to send their monthly rent payments directly to USRP.  (Id.)[2]

Based on the bankruptcy decision, the Court finds that the parties were not bound

by any contractual relationship as of June 26, 2006.  Therefore, the Court must

address the ensuing question of whether Plaintiffs have proffered sufficient

evidence to create a triable issue of fact as to whether the payments it made to

USRP subsequent to August 1, 2006 constituted a lease "renewal" pursuant to

Section 486H-10.4 of the Hawaii Revised Statutes.

B.    Renewal Of The Sublease Agreement

Section 486H-10.4 does not define the term "renewal," and therefore

the Court must attempt to discern the meaning ascribed by the legislature.  Sections

486H-2 and 486H-3 of the Hawaii Revised Statutes discuss the circumstances under

---

[2]Even assuming, as Defendants assert, that further steps were necessary for rejection of the Sublease Agreement, the Court finds that the Attornment Agreement is unenforceable pursuant to the statute of frauds.  Despite BC Oil's obligation to obtain USRP's signature on the Attornment Agreement, USRP never signed the document.  Section 656-1 of the Hawaii Revised Statutes states in part that:

"[N]o action shall be brought and maintained . . . [u]pon any contract for the sale of lands, tenements, or hereditaments, or of any interest in or concerning them . . . unless the promise, contract, or agreement, upon which the action is brought, or some memorandum or note thereof, is in writing, and is signed by the party to be charged therewith, or by some person thereunto by the party in writing lawfully authorized.

Pursuant to the statute of frauds, USRP's failure to endorse the Attornment Agreement Renders it unenforceable.

11

which a petroleum distributor may refuse to renew a franchise and the procedure that must be followed.  Section 486H-2(a) states in part that "a petroleum distributor shall be liable to a gasoline dealer . . . for damages and such equitable relief as the court deems proper resulting from the wrongful or illegal termination or cancellation of the franchise during its term or the petroleum distributor's unreasonable refusal to renew the franchise."  Section 486H-3 provides that "[a] petroleum distributor shall not terminate, cancel, or refuse to renew a franchise with a gasoline dealer without first giving the dealer written notice . . ."

In evaluating Section 486H-10.4 within the framework of the Hawaii Gas Cap Law as a whole, the Court finds that the term "renewal" as used in this section is synonymous with "franchise renewal" as used in the other sections. Section 486H-1 of the Hawaii Revised Statutes defines "franchise" in pertinent part as "any agreement between a petroleum distributor and a gasoline dealer under which the gasoline dealer is granted the right to occupy the premises owned, leased, or controlled by the distributor . . ."  Therefore, Section 486H-10.4 is triggered whenever a petroleum distributor renews the lease of a gasoline dealer to occupy premises owned by the distributor.  See Haw. Rev. Stat. § § 486H-1 and 486H-10.4. However, the Court must still address the legislature's intent to limit the rent caps in Section 486H-10.4 to "renewals."

12

In construing the meaning of the term "renewal," the Court must consider the legislative purpose behind the Gas Cap Law, which was to limit the amount of rent that petroleum distributor may charge a franchise or service station. Affording the term a narrow interpretation would render it a nullity as petroleum distributors could avoid the proscriptions of the statute by simply characterizing their lease agreements as "extensions" or "new" leases as opposed to renewals. On the other hand, as noted in this Court's January 27, 2006 Order Denying Defendants' Motion to Dismiss, the legislature's limitation of the rent cap provisions to "renewals" as opposed to all new leases clearly evidences its intent to circumscribe the scope of the statute. Unfortunately, the legislative history sheds little light on the issue.

The Court recognizes that the distinction between actions constituting a renewal of a lease, an extension of a previous lease, or the creation of a new lease may often be ephemeral at best. See e.g. Leibovitz v. Christo, 75 So. 2d 692, 693 (Fla. 1954). Indeed, there is no Hawaii authority on point. Black's Law Dictionary defines "renewal" in pertinent part as "[t]he re-creation of a legal relationship or the replacement of an old contract with a new contract, as opposed to the mere extension of a previous relationship or contract." Black's Law Dictionary 1322 (8th ed. 2004). Other jurisdictions have found that the chief distinction between an "extension" and

13

a "renewal," is that, in the case of renewal, a new lease is required, while in the case of an extension, the old lease continues in force for an additional period. <u>Trustees of First Union Real Estate Equity and Mortgage Investments v. Mandell</u>, 987 F.2d 1286, 1289 (7th Cir. 1993). A new lease implicates the formalization of an agreement between the parties to continue with the existing contractual relationship. <u>See</u> <u>Dubinsky Realty, Inc. v. Vactec, Inc</u>, 637 S.W.2d 190, 192 (Mo. Ct. App. 1982) ("[t]he technical distinction between the two is that an extension generally does not require a new grant and may occur in situations where the tenant remains in possession subsequent to the expiration of the lease term and continues to pay rent which the landlord accepts. A renewal, on the other hand, implies a new grant for an additional term and generally requires the execution of a new document to be effective"); <u>Howell v. Hamburg Co.</u>, 131 P.130, 132 (Cal. 1913) (stating that a renewal of lease requires the "making of a new lease"); 49 Am. Jur. 2d Landlord and Tenant § 141 (2006) (stating that in most jurisdictions a renewal requires a new lease or a formal extension of an existing lease). The Court finds this argument persuasive in light of the fact that a "renewal" pursuant to Section 486H-10.4 necessarily includes certain specific items including a minimum time period for scheduling subsequent renewals. Therefore, absent some formal document evidencing the

renewal and its terms, the continued occupancy of tenant is considered an extension, and the lease cap provisions of Section 486H-10.4 are not applicable.

In the instant case, there is no dispute that the parties never executed a new lease agreement or any other document that would indicate the formation of a new, contractual relationship.  Instead, Plaintiffs ask this Court to consider Defendants' decision to allow them to continue to occupy the premises after the rejection of the Sublease Agreement coupled with Plaintiffs' agreement to pay rent directly to USRP as evidence of a tacit agreement between the parties sufficiently constitute a renewal of the lease subject to Section 486H-10.4.  As noted above, the Court need not delve into factual questions such as the intent of the parties where no formalized agreement exists.  By letter of July 9, 2001, USRP informed Plaintiffs that the bankruptcy court had rejected the Sublease Agreement.  The parties never moved to memorialize their respective obligations under a new contract.  Instead, Plaintiffs simply continued to pay rent at the amounts set forth in the Sublease Agreement until its expiration in May 2004.[3]  Under these circumstances, the Court finds that as a matter of law, no renewal occurred as set forth in Section 486H-10.4 of the Hawaii Revised Statutes.

---

[3]Both parties agree that aside from the rent payments, which were diverted directly to USRP, they continued to operate under the terms of the Sublease Agreement.

15

III.   <u>Plaintiffs' Claims For Damages Under Section 486H-11 And Unjust Enrichment</u>

Plaintiffs' Complaint seeks to recover damages pursuant to Section 486H-11 of the Hawaii Revised Statutes.  However, Section 486H-11 simply imbues those injured by violations of Section 486H-10.4 with the right to bring a civil suit to recover damages.  Where there is no violation of Section 486H-10.4, there can be no recovery pursuant to Section 486H-11.

Plaintiffs' claim for unjust enrichment suffers from the same infirmity. Where Defendants committed no statutory violations, they cannot be said to have been unjustly enriched.

<u>CONCLUSION</u>

For the reasons stated above, the Court GRANTS Defendants' Motion for Summary Judgment.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, October 31, 2006.



_____
David Alan Ezra
United States District Judge

<u>Andrew Pung, et al. vs. Truststreet Properties, et al.</u>, CV No. 05-00618 DAE/KSC; ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

16